**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Lisa Pedersen,

                Plaintiff,        Civ. No. 12-2649 (RHK/JSM)
                                        **MEMORANDUM OPINION**
v.                                          **AND ORDER**

Bio-Medical Applications of Minnesota
d/b/a Fresenius Medical Care,

                Defendant.

Kaarin S. Nelson, V. Joshua Socks, Clayton D. Halunen, Halunen & Associates, Minneapolis, Minnesota, for Plaintiff.

Marko J. Mrkonich, Rhiannon C. Beckendorf, Sarah J. Gorajski, Littler Mendelson, P.C., Minneapolis, Minnesota, for Defendant.

**INTRODUCTION**

Plaintiff Lisa Pedersen alleges in this action that her former employer, Defendant Bio-Medical Applications of Minnesota d/b/a Fresenius Medical Care ("BMA"), a dialysis company, terminated her employment after she reported that certain blood samples had been improperly handled. She asserts a single claim under the Minnesota Whistleblower Act ("MWA"), Minnesota Statutes § 181.932. BMA now moves for summary judgment. For the reasons that follow, its Motion will be granted.

**BACKGROUND**

The pertinent facts are undisputed. BMA operates dialysis clinics throughout Minnesota, serving individuals suffering from "end-stage renal disease." BMA's patients

typically require treatment two or three times per week, with each treatment lasting three to four hours.

Part of the treatment process for a dialysis patient involves monitoring the levels of certain substances in the patient's blood. To accomplish this, BMA staff members draw blood from the patient and ship it to an independent laboratory, Spectra Laboratories, Inc. ("Spectra"), for processing, after which Spectra sends the results back to BMA. Blood drawn by BMA must be refrigerated until it is packaged, in an insulated box with ice packs, and shipped to Spectra via overnight delivery; blood that rises above 46 degrees can be "compromised" and provide inaccurate testing results, potentially leading to dangerous (possibly fatal) consequences. Blood samples that have been improperly stored, however, are not necessarily redrawn from the patient. Rather, BMA staff will check to see if the samples are still cool and, if so, repackage them properly and ship them to Spectra. BMA will then compare Spectra's results to the patient's prior laboratory results, and only if the results are skewed will BMA redraw the patient's blood for analysis.

In 2007, BMA hired Pedersen as a Patient Care Technician (PCT), assisting patients during their dialysis treatments. Because she enjoyed the work and hoped to advance her career, she completed additional schooling to become a licensed practical nurse (LPN) and, later, a registered nurse (RN). After becoming an RN, Pedersen began working for BMA as a per diem nurse, working with BMA's contracted nephrologists[1] to

---

[1] A nephrologist is a medical doctor specializing in the treatment of kidney diseases. See http://www.mayoclinic.org/nephrology-rst/ (last visited January 7, 2014). BMA does not employ

provide direct patient care. Eventually, though, she sought a more regular hourly schedule and began working at BMA's clinic on Park Avenue in Minneapolis. There, she reported to Clinic Manager Jennifer Bard who, in turn, reported to Area Manager Celestine Kienzle. She also occasionally covered shifts at other BMA clinics, including one in Shakopee, Minnesota.

On the morning of April 12, 2012, a PCT (Yolanda Doss) discovered that blood drawn the previous day in the Shakopee clinic had not been picked up by Federal Express and had instead been left overnight, packed with ice but in the wrong type of shipping box, in the clinic's front lobby. Pedersen, who arrived to work at the Shakopee clinic at 5:30 am on April 12, also was told by several patients that blood samples had been "left out again." Doss touched the specimens and noted they were still cool, refrigerated them, and then repackaged them in the correct box and sent them to Spectra. There is no evidence in the record indicating the samples ever exceeded 46 degrees.

On April 13, the Manager of the Shakopee clinic, Joelle Ince, learned about the samples that had been left out overnight on April 11. She called her Area Manager (Kienzle), who told her to contact Spectra. Ince did as she was told but inadvertently called "Allina's"[2] blood lab rather than Spectra. Allina informed her that blood specimens could be left out for 48 to 72 hours without being compromised.

---

its own physicians, but rather contracts with medical groups to provide care at its clinics. Contracted nephrologists focus only on patient treatment and not the operation of BMA's clinics; day-to-day management is handled by a Clinic Manager.

[2] At the time, Ince had been the Clinic Manager in Shakopee for approximately two weeks. She testified in her deposition that when Kienzle told her to "call the lab," she looked in the clinic's

On April 14, BMA received from Spectra the results of its tests on the blood samples left out overnight on April 11, as well as samples from April 12. Only a sample drawn on April 12 contained abnormal results; all other results were within the patients' prior lab value ranges, and BMA concluded that none of the April 11 samples had been compromised by being left out overnight.[3]

On April 17, Ince and Pedersen had a meeting with Dr. Jennifer Hunt, one of BMA's contract nephrologists, to discuss patient care planning. During that meeting, as they were discussing the April 12 lab reading that was out of range, Pedersen interjected that a PCT had improperly packaged blood samples. Ince informed Dr. Hunt that the matter had been investigated and it had been determined the samples were not compromised. She also advised that the abnormal specimen had been drawn on April 12, not April 11. Dr. Hunt then ordered that blood be redrawn for the patient sample taken on April 12, but no further action was taken regarding the April 11 samples. Later that

---

Rolodex, found an entry for "lab," and dialed that number, which turned out to be a lab affiliated with Allina Health, a large medical provider in the Twin Cities. Eventually, however, she reached out to Spectra for an on-site training session on proper packaging of blood specimens, but it is unclear when that took place.

[3] According to Pedersen, "[t]he results for some of the patients whose labs were left out were coming back [from Spectra] with high levels of potassium." (Mem. in Opp'n at 13.) But none of the evidence she cites actually supports that contention. For example, she points to paragraphs 2 and 3 of Bard's Affidavit, but those paragraphs only indicate that improper packaging *might*, in the abstract, skew lab results. (See Bard Aff. ¶ 2 (insufficient packaging "could result in erroneous test results"); id. ¶ 3 ("If samples are allowed to remain at room temperature for extended periods, [they] may likely give erroneous results.").) Indeed, she testified in her deposition that she was *unaware* of the results of the testing performed on the April 11 specimens. (See Pedersen Dep. at 182 ("Q. So do you know if any of the labs that were drawn on the 11th . . . had abnormal readings? A. I do not know."); id. at 185 ("Q. So you don't know if, in fact, . . . all of the draws done on April 11th showed up as normal? . . . A. I, I don't know what they showed up as.").)

day, Pedersen called Kienzle to again report the "mishandling" of the April 11 samples, asking that they be redrawn.  According to Pedersen, Kienzle responded, "Don't tell the doctor.  We don't tell the doctors.  We are going to take care of this in the clinic."[4]

In the subsequent days, Pedersen reported the "mishandled" April 11 blood specimens several additional times.  On April 18 and again on April 19, she called BMA's Employee Access and Response (EAR) telephone line.  She also called Kelli Tarlton, a BMA Regional Vice President, and Martha D'Sanchez, BMA's Employee Relations Manager, both of whom inquired of Kienzle, who informed them that the matter had been investigated and the specimens had not been affected.  Pedersen claims this was part of a "cover up" by Kienzle to keep Pedersen from making her "look bad."

According to Kienzle, on April 19 a patient reported that Pedersen had slapped her on the arm on April 4; Pedersen disputes having engaged in such conduct.  Regardless, before BMA could undertake an investigation, Pedersen went on medical leave.  She contends, however, that while she was on leave, Kienzle repeatedly asked Bard if there was a way to "get rid of" Pedersen and suggested a number of (purportedly) contrived reasons she could use to justify Pedersen's discharge.

Pedersen's leave ended on May 29, 2012.  That same day, Kienzle informed her that she was suspended pending an investigation by BMA, due to the slapping incident

---

[4] Kienzle acknowledges making a somewhat similar statement, but contends it was in response to Pedersen labeling "incompetent" the PCT who had "mishandled" the April 11 specimens. Kienzle responded by saying, "You didn't say that to the doctor, did you?" (Kienzle Dep. at 111-12.)

and several other performance issues.[5] Following its investigation, BMA determined that Pedersen would be permitted to return to work, but she would receive a "corrective action" plan upon her return.

On June 15, 2012, Pedersen's counsel faxed a letter to BMA, asserting that Pedersen had been constructively discharged in retaliation for her complaints regarding the April 11 blood samples. BMA's counsel responded that Pedersen had *not* been discharged and requested that she return to work on June 25, 2012, but in a PCT position working more days per week than she had previously worked. Pedersen's counsel informed BMA that she would not return to work unless, among other things, (1) she were permitted to work 3 days per week, in a "float" position, (2) BMA instituted company-wide whistleblower training, and (3) the company informed all persons involved that BMA had committed a "medical error" regarding the April 11 blood samples. The company refused these requests. Additional efforts in July and August 2012 to reach an accord between the parties failed, and by letter dated September 4, 2012, BMA informed Pedersen that her employment had been terminated due to "abandonment" of her job.

On September 27, 2012, Pedersen commenced the instant action in the Hennepin County, Minnesota District Court. Her single-count Complaint alleges that BMA retaliated against her, in violation of the MWA, for reporting BMA's "mishandling" of

---

[5] Among other things, BMA contended that Pedersen had (1) inappropriately telephoned a patient and asked her to bake Pedersen a pie (which Pedersen acknowledges); (2) impersonated Bard on several occasions; and (3) violated several BMA policies, including arguing with staff in front of a patient and discussing a patient's medication with a physician who was not the patient's doctor.

the April 11 blood specimens and the "cover up" of that "mishandling."  Invoking diversity jurisdiction, BMA removed the case to this Court on October 17, 2012.  The parties have undertaken extensive discovery, and with that discovery complete, BMA now moves for summary judgment.  The Motion has been fully briefed, the Court heard oral argument on December 23, 2012, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

The MWA prohibits an employer from taking adverse action against an employee who, in good faith, "reports a violation or suspected violation of any federal or state law

. . . to an employer" or "reports a situation in which the quality of health care services provided by a health care facility . . . violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm." Minn. Stat. § 181.932, subd. 1(1), (4). The first step in any whistleblower case, therefore, is determining whether the employee engaged in statutorily protected conduct, that is, reported in good faith either (i) a violation or suspected violation of the law or (ii) a situation in which the quality of care provided by a health-care facility violated some federal or state law or ethical standard. The plaintiff bears the burden of showing she engaged in conduct protected by the MWA. See, e.g., Kidwell v. Sybaritic, Inc., 749 N.W.2d 855, 864 (Minn. Ct. App. 2008) ("[T]he plaintiff must prove that he engaged in statutorily protected conduct."), aff'd, 784 N.W.2d 220 (Minn. 2010). For two reasons, the Court concludes that Pedersen has failed to show she engaged in statutorily protected conduct here.

First, Pedersen cannot show that her complaints about the April 11 blood samples constituted "reports" under the MWA. This is because, when she raised the issue, BMA was already fully aware of it and had taken steps to address it. Minnesota courts have long recognized that "the mere mention of a suspected violation that the employer already knows about does not constitute a 'report' under the [MWA]." Erickson v. City of Orr, No. A05-481, 2005 WL 2277395, at *7 (Minn. Ct. App. Sept. 20, 2005) (citing Rothmeier v. Inv. Advisers, Inc., 556 N.W.2d 590, 593 (Minn. Ct. App. 1996)); accord, e.g., Kidwell, 749 N.W.2d at 869; Cokley v. City of Otsego, 623 N.W.2d 625, 632 (Minn. Ct. App. 2001). This Court has reached the same conclusion on several

occasions. See, e.g., Harnan v. Univ. of St. Thomas, 776 F. Supp. 2d 938, 948 (D. Minn. 2011) (Montgomery, J.) ("A report is [] not a mere mention of already known information.") (quotation marks omitted); Pelant v. Pinnacle Airlines, Inc., Civ. No. 05-1173, 2006 WL 2286381, at *6 (D. Minn. Aug. 8, 2006) (Schiltz, J.) ("[T]he Minnesota Whistleblower Act does not protect employees who merely inform their employers of unlawful conduct of which the employers were already aware."); Freeman v. Ace Tel. Ass'n, 404 F. Supp. 2d 1127, 1140 (D. Minn. 2005) (Davis, J.), aff'd, 467 F.3d 695 (8th Cir. 2006). The reason is simple: the MWA is intended to protect employees who "blow the whistle," that is, "*expose* an illegality." Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000) (emphasis added). "Reporting" what an employer already knows "exposes" nothing – the employee simply has "no whistle to blow" in that circumstance. Hitchcock v. FedEx Ground Package Sys., Inc., 442 F.3d 1104, 1106 (8th Cir. 2006) (citing Obst); accord, e.g., Fjelsta v. Zogg Dermatology, PLC, 488 F.3d 804, 808-09 (8th Cir. 2007).[6]

Here, Doss discovered that specimens had been left out on the morning of April 12, and she repackaged them and sent them to Spectra that same day. On April 13, Ince learned about the matter and reported it to Kienzle; Kienzle told her to check with the lab, and Ince did so and was informed that blood samples could be left out for up to 72 hours.

---

[6] Some cases analyze this issue differently, asking not whether the employee made a "report" but rather whether she acted "in good faith." See, e.g., Mahazu v. Becklund Home Health Care, Inc., No. C8-02-28, 2002 WL 1751280, at *3-4 & nn.1, 3 (Minn. Ct. App. July 30, 2002); see also Kidwell, 749 N.W.2d at 868-69 (noting some decisions consider an employer's prior knowledge of a violation when assessing the employee's good faith, while others consider prior knowledge when assessing whether the employee made a report under the MWA). Regardless of the lens through which a whistleblower claim is analyzed, the "central question" always remains whether the report was made "to expose an illegality." Obst, 614 N.W.2d at 202.

The following day, BMA received the lab results from Spectra, which confirmed that the April 11 samples had not been compromised. *All* of this transpired before Pedersen first raised the issue with Dr. Hunt on April 17, at which time Ince stated that the matter had been investigated and resolved. Under these facts, the Court concludes that Pedersen had nothing to expose – "no whistle to blow" – by the time she first (and later again) raised the matter.[7]

To be sure, Minnesota courts have recognized that an employer's prior knowledge of a violation at the time of an employee's report does not *necessarily* exempt the employer from liability. See, e.g., Kidwell, 749 N.W.2d at 869 (noting there is no "absolute rule"); Obst, 614 N.W.2d at 203 (rejecting notion that "whenever an employer establishes that it . . . knows of the violation before the report is made, [] the employer can escape liability under the whistle-blower statute"). Obst offered two examples of when liability may exist despite the employer's prior knowledge: (i) an employee reports the violation to an outside government official or law enforcement entity, or (ii) an employee reports the violation to her employer without knowledge that the employer already was aware of it. Id. at 203 n.5. But Pedersen cannot shoehorn her case into these exceptions, and in fact she has made no effort to do so. There is no evidence here that she reported the handling of the April 11 specimens to law enforcement or any other outside entity. Nor has she pointed to any evidence – despite bearing the burden of

---

[7] Pedersen wrongly contends that whether she engaged in protected conduct presents a jury question. (See Mem. in Opp'n at 29-30.) Courts have repeatedly recognized that whether an employee's conduct constituted a "report" may be decided as a matter of law. See, e.g., Fjelsta, 488 F.3d at 809 ("[T]he court may determine as a matter of law that certain conduct does not constitute a report for purposes of the Whistleblower Act.") (citing Cokley, 623 N.W.2d at 630).

establishing she engaged in protected conduct – as to what she believed (or did not believe) BMA knew when she first raised the issue on April 17.  Simply put, Pedersen has failed to show that her complaints amounted to "reports" protected under the MWA.[8]

Second, even if Pedersen's complaints constituted "reports," her claim would still fail because those "reports" did not implicate a violation of any law or ethical standard.  She attempts to buttress her claim by pointing to various rules and regulations showing a (supposed) violation, but none suffices.

Pedersen begins by citing Minnesota's Nurse Practice Act, Minn. Stat. § 148.191 *et seq.*  (See Mem. in Opp'n at 22-25.)  But that statute says nothing about the handling or transportation of blood samples or when doing so might be unlawful.  Rather, it simply sets forth broad generalities about the types of conduct that can result in the imposition of discipline upon a nurse.  The statute in no way shows that the (mis)conduct "reported" by Pedersen – leaving blood samples out overnight – was unlawful or unethical.  Furthermore, the statute regulates only the conduct of *nurses*; it says nothing about clinics or other health-care providers (such as BMA) or under what circumstances those providers might be violating the law.  To the extent Pedersen relies on the Nurse Practice Act, she is merely attempting to avoid consequences that *she* (as a nurse) allegedly could

---

[8] Pedersen *does* argue that her complaints were protected because several of the persons to whom she complained – Dr. Hunt, Tarlton, and D'Sanchez – were unaware of the issue. (Mem. in Opp'n at 32.)  But this cannot save her claim.  It is undisputed that two BMA managers – Ince, the Shakopee Clinic Manager, and Kienzle, the Area Manager – were aware of the matter at the time Pedersen complained.  The fact that she reported the issue to others does not show that she "expose[d] illegality" *to BMA*.  See Fjelsta, 488 F.3d at 808-09 (letter plaintiff delivered to clinic owner complaining of illegal conduct was not protected under MWA where plaintiff had previously discussed matter with office manager, her immediate supervisor, and hence the clinic "was well aware of the alleged violation before Fjelsta wrote the letter").

have suffered for failing to report the matter. This is not whistleblowing. See Obst, 614 N.W.2d at 202 (report made for purpose of protecting employee's own job not protected under MWA).

Pedersen next argues that BMA violated Spectra's "precise procedures" for handling blood. (See Mem. in Opp'n at 25.) But as the undersigned recently noted, it is not enough to allege that a defendant violated internal policies; *illegal* (or unethical) conduct is required. Weigman v. Everest Inst., __ F. Supp. 2d __, 2013 WL 3929045, at *3 (D. Minn. July 30, 2013) (Kyle, J.). Pedersen attempts to squeeze her claim through this hole by citing "interpretive guidance" issued by the Centers for Medicare & Medicaid Services, which supposedly incorporate dialysis providers' own internal procedures. (Mem. in Opp'n at 24-25.) But assuming *arguendo* that violating such "guidance" would be illegal or unethical, it does not aid Pedersen here because the cited guidance simply notes that dialysis providers must "operate and maintain *equipment* in accordance with the manufacturer's instructions." (Pl. Ex. 13 at 163 (emphasis added).) Pedersen does not explain how blood samples are "equipment" or are otherwise implicated by this guidance.

Pedersen also cites several federal regulations regarding a patient's right to privacy and confidentiality and empowering clinic medical directors to ensure that all procedures regarding patient care are adhered to. (See Mem. in Opp'n at 27 (citing 42 C.F.R. §§ 494.150(c)(2)(i), 494.70).) Yet again, however, none of the regulations discusses the handling of blood specimens. And Pedersen has failed to explain how the

alleged misconduct she reported – leaving blood samples out overnight – would transgress these regulations.

Finally, Pedersen contends that Kienzle's "cover up" also amounted to a violation of the law, purportedly flouting regulations regarding a patient's right to be informed about all aspects of his or her care. (See Mem. in Opp'n at 27 (citing 42 C.F.R. § 494.90).) There are two problems with this contention, however. First, it is undisputed that Kienzle immediately directed Ince to contact Spectra when she learned the April 11 specimens had been left out overnight – quite the opposite of a "cover up." Second, Pedersen's argument is predicated on an assumption that the specimens were (or potentially were) compromised. (See Mem. in Opp'n at 23 (cover-up allegation based on "Kienzle's knowing attempt . . . to avoid looking bad while allowing the patients' treatment plans to be altered *based on potentially false or misleading lab results*") (emphasis added); id. at 25 (claiming a violation of law based on "skewed labs").) But by the time Pedersen first reported the so-called "cover up," she had already learned (through her April 17 meeting with Ince and Dr. Hunt) that the samples were *not* compromised, and she acknowledges that she possesses no evidence indicating that there was, in fact, any "problem" with the April 11 blood samples. Pedersen cites no authority for the (illogical) proposition that it is unlawful not to report a "problem" that never existed in the first place – even one purportedly related to patient care.

The Minnesota Supreme Court has cautioned "against construing section 181.932 too broadly." Kratzer v. Welsh Cos., 771 N.W.2d 14, 22 (Minn. 2009) (citation omitted). The statute does not protect reports based on an employee's subjective notions of

wrongdoing or complaints about behavior "that is problematic or even reprehensible." <u>Id.</u>  Rather, the statute reaches *only* reports of legal or ethical violations.  Pedersen has failed to show such a violation here.  Accordingly, her MWA claim must fail.

## CONCLUSION

While BMA raises other arguments the Court finds compelling, including that Pedersen cannot show its proffered reason for dismissing her was pretextual, the Court need not (and does not) reach those arguments.  At bottom, Pedersen's case dies on the vine because she cannot show she engaged in protected activity under the MWA.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that BMA's Motion for Summary Judgment (Doc. No. 57) is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Date:  January 10, 2014                              s/Richard H. Kyle
                                                    RICHARD H. KYLE
                                                    United States District Judge